Benjamin S. and Gertrude M. Dowd v. Commissioner.
Dowd v. Commissioner
Docket No. 69387.
United States Tax Court
T.C. Memo 1961-238; 1961 Tax Ct. Memo LEXIS 109; 20 T.C.M. (CCH) 1220; T.C.M. (RIA) 61238; August 24, 1961
*109 Held, petitioners failed to prove they are entitled to a net operating loss deduction in the years 1952 and 1953 based on a net operating loss carryover from 1951 because: (1) No evidence was offered with respect to petitioners' income for 1950 against which any operating loss for the year 1951 would first have to be carried back and it is impossible to compute from the evidence presented the amount of operating loss, if any, available for carryforward to 1952 and subsequent years; (2) petitioners have failed to prove by competent evidence the amount of their operating loss, if any, in 1951. *110 Louis Hoppe, Esq., for the petitioners. Norman L. Rapkin, Esq., for the respondent. DRENNEN
Memorandum Findings of Fact and Opinion DRENNEN, Judge: Respondent determined deficiencies in income tax due from petitioners for the taxable years 1952 and 1953 in the respective amounts of $2,289.42 and $1,803.74. The only issue for decision is whether petitioners are entitled to a net operating loss deduction in each of the taxable years 1952 and 1953, representing a net operating loss carryover from the taxable year 1951. Findings of Fact Some of the facts have been stipulated and are found accordingly. Benjamin S. Dowd and Gertrude M. Dowd were husband and wife residing during the years 1951, 1952, and 1953 in Rockville Centre, New York. They filed a joint Federal income tax return for the taxable year 1951 with the collector of internal revenue for the first district of New York. They filed joint Federal income tax returns for the taxable years 1952 and 1953 with the district director of internal revenue at Brooklyn, New York. Benjamin S. Dowd (hereinafter referred to as Dowd) graduated from Yale University in 1918; Fordham Law School in 1933; New York University *111 School of Finance in 1934; and he studied banking in Europe for 2 years. He served in the Army during World War I. Throughout his business career Dowd was active in a variety of business enterprises, which included taking a trip to Czechoslovakia in 1924 in an effort to dispose of a quantity of neolite soles in which Bankers Trust Company and Good-year Tire and Rubber Company had an interest, selling bonds on a commission basis in New York City and the operation of a bond department in a New York bank during the 1920's and 1930's, the formation and operation of a construction company to build buildings for the New York World's Fair in 1939-40, the production of synthetic coffee from rye in 1935-37, the formation and operation of a complex of corporations sometimes referred to as the Empire Ordnance group, which produced arms and armament for the British Government from 1940 to 1945, inclusive, the conversion and revitalization of Vulcan Iron Works from warwork to peacetime work in 1946-49, the formation of Hazleton Steel & Tubing Corporation, which is directly involved here, in 1950-51, and a mineral exploration project in Venezuela in 1952 and subsequent years. Dowd was the principal *112 or one of the principal movers in the conception of most of these enterprises. He usually acquired an equity interest in the corporations formed to conduct these enterprises and also usually became a salaried officer of the corporations. Dowd seldom sold his stock in these corporations until the corporations had become relatively inactive. In early 1950 Dowd was approached by a citizens group from Hazleton, Pennsylvania, to help alleviate an unemployment situation which had developed in that area, and as an inducement for him to do so, arrangements were made to donate 28 acres of industrial-site land to Dowd for this purpose. Dowd conceived the idea of setting up a plant for the production of seamless steel tubing which was in short supply at that time. To carry out this plan, Dowd organized the Hazleton Steel & Tubing Corporation (hereinafter referred to as Hazleton) in September 1950 and became its sole officer and stockholder. The land was conveyed to the corporation, which appears to have been its only capital. Dowd was responsible for and arranged the organization, financing, lining up of key personnel, and acquisition of machinery and other material requirements for Hazleton. *113 During 1950 and 1951 Dowd attempted to obtain a loan for Hazleton under the Defense Production Act of 1950. A loan of $7,800,000 was authorized by the Defense Production Administration but was referred back to that agency for review by a committee of Congress. This occurred several times and the loan was finally canceled in the latter part of 1951 in accordance with the recommendations of a committee of the House of Representatives. Upon cancellation of the loan Dowd gave up the Hazleton project as quickly as he could and immediately advised the citizens group of Hazleton to take whatever steps were necessary to recover the land. [1]
Dowd's activities in connection with Hazleton required him to travel a good bit, particularly to Washington, and he used either his own funds or funds advanced him by his wife to pay for this and other expenses incurred in connection with the Hazleton project. Dowd realized nothing from the Hazleton project and his connection *114 therewith terminated in late 1951. On their 1951 return, petitioners reported long-term capital gain in the amount of $1,880 and other income, stated to be "compromise settlement of monies earned due from company for services rendered from 1946 to 1949," in the amount of $15,000. They reported adjusted gross income of $15,940, and they reported itemized deductions totaling $48,899.16, of which the amount of $42,900 was explained by petitioners with the following statement: $42,000.00 Ordinary and necessary expenses paid or incurred for production, acquisition, and development of income. I created, formed and sponsored Hazleton Steel & Tubing Corporation, Hazleton, Pennsylvania, acquired the land and donated it to the corporation (28 acres of choice industrial site along the Lehigh Valley tracks, appraised at $6,000 per acre or $168,000), lined up all personnel, operating and engineering, lined up all equipment and facilities, arranged for the sale of the end products which necessitated much travel expense etc. The plant was to have a capacity of 120,000 tons annually of seamless tubing and casing with a conservative gross sales of over $20,000,000 with an indicated profit of *115 approximately $3,000,000. A loan of $7,800,000 was granted to this company on February 19, 1951 by the Defense Production Administration. Congressional hearings on this loan were held during March and April 1951. After these hearings and a review by the Defense Production Administration, the loan was reapproved on April 19, 1951. Further hostile Congressional hearings were held. The loan was again approved and passed for the third time by the Defense Production Administration and the National Production Administration. The word hostile is used advisedly because when I appeared before the Congressional Committee, I was refused an opportunity to be heard. This third approval was on June 14, 1951. At closed hearings the Congressional Committee continued to recommend against the loan. In August of 1951 the loan was cancelled, the Committee's recommendation finally prevailed. I owned 50% of the capital stock. The unfavorable publicity in Washington, D.C. thereafter made private financing impossible. This caused me grave losses. A year and half work (May 30, 1950 to December 31, 1951) was entirely lost. During this time I borrowed over $27,500 in addition to other monies expended as well *116 as attorneys fees of over $38,000 all of which I will have to make good. Also salary accrued was over $40,000 which was lost. Other deductions under this item are paid to American Surety Company $750.00 as personal guarantor on a bond. I was stuck with $25,000.00 on this bond and have been paying it off over past several years as my financial condition would permit. In 1951 I paid off $750.00 Life Insurance Premiums
$ 150.00
$42,900.00
On the face of their 1951 return, in reply to the question, "Do you owe any prior year Federal tax for which you have been billed?", petitioners indicated, "Yes - B. Dowd does." They subtracted their adjusted gross income, $15,940, from their total itemized deductions, $48,899.16. To the resulting figure of minus $32,959.16 they added minus $4,200, representing total exemptions, for a final result of minus $37,159.16. For the taxable year 1952, petitioners reported adjusted gross income of $26,038.75, from which they subtracted itemized deductions totaling $9,117.90, and exemption credits amounting to $3,600. The difference was $13,320.85. By a memorandum attached to the return, petitioners explained that a loss from 1951 *117 in the amount of $37,159.16 was to be applied against the income of $13,320.85 reported; that there was no tax liability for 1952; and that there was a "loss carry forward of $23,838.31 to be applied to 1953 income." On their return for 1953, petitioners reported adjusted gross income of $19,186.13 from which they subtracted itemized deductions totaling $7,863.64 and exemption credits amounting to $3,600. The difference was $7,722.49. They applied a reported "loss carry forward-1952-$23,838.61" against income reported; they reported no tax liability; and they indicated that there was a "loss carry forward for 1954" in the amount of $16,116.12. There is no evidence concerning the amount of character of gross or net income of petitioners, or of either of them, for any taxable years except 1951, 1952, and 1953. In the determination of the deficiencies here involved, respondent disallowed the net operating loss deductions claimed for 1952 and 1953 in the respective amounts of $13,320.85 and $7,722.49, on the ground that petitioners "did not sustain a net operating loss for the taxable year ended December 31, 1951 which may be carried over and considered in the determination of a *118 net operating loss deduction" for the taxable years 1952 and 1953. Petitioners did not prove that they are entitled to a net operating loss deduction in either of the taxable years 1952 or 1953. Opinion Petitioners contend that they are entitled to net operating loss deductions in the taxable years 1952 and 1953, arising from a net operating loss sustained in 1951 in Dowd's trade or business as a promoter. They maintain that the loss in 1951 amounted to at least $42,900 and was the result of Dowd's expenditures in attempting to develop Hazleton into an operational and productive company. Respondent contends that petitioners have not substantiated any expenditures which Dowd purportedly made in order to develop Hazelton; that they have not shown that Dowd's trade or business was that of a promoter of corporations; and that, in any event, petitioners have not shown the amount of a net operating loss which may be carried over to 1952 and 1953. We find it unnecessary to decide whether Dowd's trade or business was that of a promoter because even if we assume that it was, we believe petitioners have failed to prove that they are entitled to a net operating loss deduction in either *119 1952 or 1953 for at least two reasons. Petitioner have the burden of establishing that they are entitled to the net operating loss deductions in 1952 and 1953, and of showing the amounts of such deductions. Lunsford v. Commissioner, 212 F. 2d 878 (C.A. 5, 1954), affirming in part and reversing in part a Memorandum Opinion of this Court; A. Raymond Jones, 25 T.C. 1100 (1956), reversed on other issues, 259 F. 2d 300 (C.A. 5, 1958); Joe W. Stout, 31 T.C. 1199 (1959), affirmed in part sub nom. Rogers v. Commissioner, 281 F. 2d 233 (C.A. 4, 1960); James W. Pennock, Jr., 25 B.T.A. 1331 (1932), affirmed per curiam 64 F. 2d 1018 (C.A. 2, 1933). Assuming that petitioners are correct in their contention that Dowd incurred a net operating loss in his trade or business in 1951, the amount of such loss would not necessarily be the amount of a net operating loss deduction in 1952. Before a 1951 net operating loss may be considered under section 122(b)(2)(B) of the Internal Revenue Code of 1939[2] as a net operating loss carryover to 1952 (and subsequent years), it is required that such loss in 1951 "be *120 reduced by the amount, if any, of the net income for the preceding taxable year computed" with certain modifications set forth in section 122. *121 In the present case the "preceding taxable year" is 1950. Without evidence concerning petitioners' income for 1950, it is not possible to determine the 1951 loss carryover (if any) which may be the basis for a net operating loss deduction in 1952 and subsequent years. The record indicates nothing with respect to petitioners' income for 1950, except that it appears that Dowd was billed for Federal tax for some taxable year prior to 1951. Perhaps Dowd's liability for the year 1950 was the subject of a determination of deficiency, and if so, perhaps any net operating loss sustained in 1950 was completely absorbed as a carryback to that year. See A. Raymond Jones, supra. In any event, the lack of evidence permits nothing more than conjecture on the point. Furthermore, in our opinion, petitioners have failed to substantiate by satisfactory evidence the amount of Dowd's unreimbursed expenditures in connection with the Hazleton project in either 1950 or 1951. Dowd was the only witness to testify, which seems a little strange in view of the number of people he claims to have been in contact with not only in the Hazleton project but in other projects. His testimony was to *122 the effect that during 1950 and 1951 he worked 22 hours per day on the Hazleton project, that he traveled, used the telephone, and entertained extensively in connection with his attempts to obtain a Government loan, in lining up key personnel, materials, and equipment for Hazleton, and that he used his own funds for this purpose. He testified that the $42,900 claimed as a deduction on petitioners' 1951 tax return was only a part of the money he spent on this project during 1950 and 1951. In support of the figure claimed, he offered in evidence several sheets of paper purporting to be a schedule of expenditures made by him in connection with Hazleton, prepared by him at the request of his attorneys in 1958 from canceled checks he could find and worksheets used in preparing his 1951 return, from certain canceled railway and airline ticket stubs and envelopes, and from several receipted bills addressed to the corporation for printing and insurance, some of which supporting documents have dates in 1950 and some in 1951. The schedule contained a list of all the amounts shown on the canceled railway and airline tickets and envelopes, very few of which could be identified with any particular *123 person, which totaled $1,170.10. It also contained two lists entitled "Cash expense items on Project paid by B. S. Dowd," which were simply listings of all the checks found, written by Dowd to cash and written by Gertrude Dowd either to cash or to Benjamin Dowd. These two lists totaled $6,315.25. Most of the supporting checks were in amounts ranging from $10 to $50 and a number of the checks written by Gertrude were cashed at her bank with no endorsements on them. A fourth list was entitled "Miscellaneous Expenses of Project paid by B. S. Dowd" and listed all checks found, drawn to the Waldorf Astoria Hotel, the Mayflower Hotel, the Yale Club, the Rockville Country Club, the New York Telephone Company, and several small checks to a law firm and to two newspapers. These checks totaled $4,374.75. Some of the checks were drawn by Gertrude and were deposited directly by the payee with no endorsement by Dowd. A fifth list was entitled "Miscellaneous Expenses paid by cash by B. S. Dowd" and consisted of three items paid to the Yale Club, an estimate of $1,800 paid for engineering work and $4,000 paid for contracting work with no payees specified, and an estimate of $5,000 paid for various *124 trip expenses other than travel. The total of all the above lists is $22,966.83 and the above items comprise all of the evidence offered by petitioners in support of the $42,900 deduction claimed on their 1951 return, except for the generalized testimony of Dowd summarized above. It will be noted that the schedule described above supports only a little over half of the deduction claimed. None of the underlying checks or ticket stubs indicate that they were used in connection with the Hazleton project, the only evidence of this being Dowd's testimony that all of them were, without giving details as to any of them. Further, it seems quite unlikely that a number of the checks, particularly those drawn by Gertrude to cash or some payee other than Dowd, were used for the Hazleton project. In our opinion, based on all the evidence, petitioners have not carried their burden of proving the amount of the expenditures claimed to be deductible relating to the Hazleton project. Petitioners suggest use of the Cohan rule [3] in the event the amount of the expenses cannot be accurately determined. We acknowledge that Dowd must have incurred some expense in attempting to set up the Hazleton project *125 and that it may have been a rather sizeable amount. However we cannot find on the record before us that those expenses exceeded petitioners' net income of $9,940.84 in 1951, which would be the very minimum necessary in order to give petitioners a net operating loss deduction for 1952, to say nothing of 1953; and even this would not be taking into consideration the amount of any loss incurred in 1951 which would have to be carried back first to 1950, nor any portion of the expenses incurred and paid in 1950 that might first have to be carried back to offset income of 1949.
Petitioners have not established the facts necessary to allow them the disputed deductions. James W. Pennock, Jr., supra. Decision will be entered for the respondent. Footnotes
1. Greater details of Dowd's participation in these various enterprises are not given because they are pertinent only to a decision of whether Dowd was in the business of promoting, which we do not find it necessary to decide.↩
2. SEC. 122. NET OPERATING LOSS DEDUCTION. (b) Amount of Carry-Back and Carry-Over. - * * *
(2) Net operating loss carry-over. - * * *
(B) Loss for Taxable Year Beginning After 1949. - If for any taxable year beginning after December 31, 1949, the taxpayer has a net operating loss, such net operating loss shall be a net operating loss carry-over for each of the five succeeding taxable years, except that the carry-over in the case of each such succeeding taxable year (other than the first succeeding taxable year) shall be the excess, if any, of the amount of such net operating loss over the sum of the net income for each of the intervening years computed - * * *
For the purpose of the preceding sentence, the net operating loss for any taxable year beginning after December 31, 1949, shall be reduced by the amount, if any, of the net income for the preceding taxable year computed - (i) with the exceptions, additions, and limitations provided in subsection (d)(1), (2), (4) and (6), and (ii) by determining the net operating loss deduction for such preceding taxable year without regard to such net operating loss and without regard to any reduction specified in subsection (c).↩
3. Cohan v. Commissioner [2 USTC [*] 489], 39 F. 2d 540↩ (C.A. 2, 1930).